**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| SANDRA HODSON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HONEYWELL INTERNATIONAL, INC.,<br><br>Defendant. | Civil Action No.: 3:26-cv-01005<br><br>**COMPLAINT - CLASS ACTION** |

Plaintiff Sandra Hodson ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Honeywell International Inc. ("Honeywell" or "Defendant") as follows, based on personal knowledge with respect to herself and on information and belief derived from investigation of counsel, review of Plan documents and participant-facing benefits materials and public records as to all other matters:

## NATURE OF THE ACTION

1. It is both unfair and unlawful for an employer to require employees to pay more for health coverage because they use tobacco unless the employer complies with the Employee Retirement Income Security Act of 1974 ("ERISA") and its wellness-program requirements. Honeywell imposes just such a differential. Under the Honeywell Benefit Plan (the "Plan"), Honeywell imposes additional medical-coverage contributions on participants classified as tobacco users. The Plan imposed a surcharge of $19.23 weekly or roughly $1,000 annually. Its participant materials explain that participants who satisfy Honeywell's initial tobacco-free standard avoid those charges. ERISA permits such health-based premium differentials ***only if*** Honeywell satisfies every applicable condition of the wellness program exception, including a

compliant reasonable alternative standard, the same, full reward, and the required notices. See 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3)(C)–(E).

2. To impose a lawful tobacco surcharge, a plan must make available a compliant wellness program that gives employees an avenue to avoid the surcharge. Making such a program available means complying with the requirements of ERISA and the implementing regulations adopted by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments"). Congress authorized the Departments to promulgate regulations implementing ERISA's health-status nondiscrimination requirements. The Departments established a framework that must be satisfied to qualify for the statutory wellness-program exception or safe harbor. A plan sponsor invoking that exception must demonstrate compliance with each applicable requirement.

3. ERISA's regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, rather than operate as "subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations require a compliant reasonable alternative standard that permits participants to obtain the full reward, including the value of premium relief corresponding to the period before the alternative was satisfied, and proper notice to participants. *See* Final Regulations, 33159–63. A wellness program must be genuinely designed to improve health or prevent disease, rather than function as an improper penalty imposed under the guise of a health initiative. Honeywell's program imposes a tobacco surcharge while failing to make the full reward uniformly available and failing to provide the required notice in all materials describing its terms.

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

4. Honeywell's participant materials illustrate the problem. Its 2025 New Hire Guide explains that surcharges will apply to covered employees and spouses or domestic partners who fail to complete the annual biometric screening or whose screening results are positive for nicotine. It identifies HealthResource cessation support but does not explain how a tobacco user who satisfies an alternative after the pre-year deadline obtains the full monetary value of the annual reward. *See* Ex. A, 2025 New Hire Guide at 11. Honeywell's 2024 Annual Benefits Enrollment FAQ similarly warns that employees who completed screening after September 30 or tested positive for nicotine would see a surcharge in the enrollment module, and it discusses an exception through HealthResource without explaining the right to the full reward. *See* Ex. B, 2024 Annual Benefits Enrollment FAQ at 2.

5. Honeywell's required notice is independently deficient. The 2025 New Hire Guide identifies the screening requirement, tobacco-related surcharge, cessation resources, and contact information, yet fails to inform participants that recommendations from their personal physicians will be accommodated in establishing a reasonable alternative standard. The 2024 Annual Benefits Enrollment FAQ likewise describes surcharge triggers and exceptions but omits that protection. Honeywell's own benefits website expressly instructs tobacco users that, to avoid the surcharge in 2027, they must enroll in a tobacco cessation program and complete at least one coaching call by October 9, 2026. Yet the website does not include the required personal-physician assurance. Other participant-facing communications, such as a 2025 biometric mailer, similarly describe the surcharges and the steps necessary to avoid them without providing that assurance. *See* Ex. C, 2025 Biometric Mailer. Honeywell's June 2026 screening FAQ, which details the requirements for 2027, suffers from the same omission. *See* Ex. D, 2026 Biometric FAQ. A hyperlink to a

separate notice or a generalized reference to accommodations cannot substitute for the prescribed notice in each Plan material describing the substantive terms of the wellness program.

6. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.

7. Outcome-based programs,[3] such as a program that rewards participants for being tobacco-free while requiring tobacco users to complete a cessation program, must offer a

---

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward. . . if a wellness program tests individuals for specified medical conditions or risk factors . . . and provides a reward to individuals identified as within a normal or healthy range for these medical conditions or risk factors, while requiring individuals who are identified as outside the normal or healthy range (or at risk) to take additional steps . . . to obtain ***the same reward***" as the individual within the normal range. 29 C.F.R. § 2590.702(f)(1)(v) (emphasis added).

compliant reasonable alternative standard through which all similarly situated individuals may obtain the reward or avoid the penalty. The implementing regulations require the same, full reward for participants who satisfy the reasonable alternative during the applicable plan year.[4] The Departments explained that every individual participating in a wellness program should be able to receive the full amount of the reward or incentive. Final Regulations, 33160, 33163. Honeywell violates those requirements by limiting existing employees to prospective surcharge removal, preserving earlier deductions even after satisfaction of the alternative, and failing to give the required notice in all materials describing the program's terms.

8. Honeywell cannot invoke the statutory wellness-program exception under 29 U.S.C. § 1182(b)(2)(B) and 42 U.S.C. § 300gg-4(b)(2)(B) merely by offering a cessation telephone number. Although it charges participants differently based on tobacco status, its published materials omit disclosures required for a lawful health-contingent wellness program, and, upon information and belief, its administration of alternatives in portions of the Class Period did not furnish the same, full reward. Compliance with every applicable requirement of 29 C.F.R. § 2590.702(f)(4) is a precondition to the exception.

9. The financial consequences of those violations benefited Honeywell. Honeywell describes its medical program as self-insured and expressly states that its tobacco surcharge helps offset health-care costs. Participant contributions withheld from wages for an ERISA welfare plan

---

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

become Plan assets as of the earliest date they can reasonably be segregated from the employer's general assets. 29 C.F.R. § 2510.3-102(a)(1). The Plan documents described benefits funded by Honeywell's general funds and employee contributions, with Honeywell retaining discretion over contribution rates and administration. Upon information and belief, Honeywell applied the additional contributions toward Plan costs otherwise funded by the employer and retained the corresponding corporate funds. To the extent Honeywell held employee contributions after they became Plan assets, it also obtained their use and time value.

10. Honeywell imposes a tobacco-based premium differential while omitting prescribed disclosures from participant-facing materials that explain the program's terms. Its 2024 FAQ and 2025 New Hire Guide do not tell participants that an alternative will deliver the full value of the same annual reward or that recommendations of their personal physicians will be accommodated. Other materials similarly omit required information. Honeywell's June 2026 FAQ expressly offers a full refund of tobacco surcharges assessed during 2027 when the participant completes a HealthResource cessation program by December 31, 2027. Plaintiff does not allege that this announced 2027 refund remedy has already been denied; Plaintiff challenges the deficiencies affecting the relevant earlier years and the independent notice violations reflected in the published materials.

11. This Complaint challenges a health-based tobacco surcharge imposed without a fully compliant wellness program. Honeywell bears the burden of establishing the exception on which it relies to justify that differential. Requiring participants to pay more based on tobacco status while withholding the full reward through the alternative-standard process, or omitting required disclosures from materials describing the program, defeats the exception. An undisclosed

administrative practice cannot substitute for the notice the regulations require. Whether Honeywell actually administered full refunds in 2024–2026 is ascertainable from its records.

12. Participants may challenge a surcharge when the employer fails to make a compliant wellness program available or provides deficient program notices. Once a participant like Ms. Hodson alleges a health-based differential and noncompliance, Honeywell must establish the conditions for the applicable statutory exception. The claims concern statutory nondiscrimination, fiduciary administration, and equitable relief, rather than payment for particular medical services. Plaintiff seeks recovery of improper contributions and appropriate Plan-level relief without duplicative recovery.

13. Plaintiff Sandra Hodson participated in Honeywell-sponsored medical coverage and paid the tobacco surcharge throughout 2026 and earlier. She was charged a tobacco surcharge for both herself and her spouse and she was unaware that she could satisfy a physician-directed reasonable alternative standard to obtain the lower premium. She brings this action individually, on behalf of similarly situated participants, and, as to the claim under ERISA § 502(a)(2), on behalf of the Plan. She seeks appropriate equitable relief for the additional amounts collected under a differential Honeywell cannot justify under ERISA, and restoration of profits and other financial benefits Honeywell obtained through its fiduciary breaches.

## **PARTIES**

14. Plaintiff Sandra Hodson is an individual residing in the United States who, throughout the relevant period, worked for Honeywell. She participates in the Plan's medical coverage and paid tobacco-related surcharges throughout 2026 and in prior years because Honeywell classified her and her spouse as tobacco users. Throughout this period, Plaintiff paid $19.23 for herself and an additional $19.23 for her spouse each week. The amount of each deduction and the total collected are reflected in Honeywell's payroll and contribution records.

15. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

16. Defendant Honeywell International Inc. ("Honeywell") is a Delaware corporation headquartered in Charlotte, North Carolina. Honeywell is the Plan sponsor and administrator. Honeywell sponsors the Plan and, upon information and belief, exercises discretionary authority over administration of the challenged medical-premium surcharge, its alternative-standard process, participant communications, and employee contributions. Honeywell is a fiduciary to the extent it exercises discretionary authority over administration or authority or control over Plan assets. 29 U.S.C. § 1002(21)(A).

17. The Plan is an employee welfare benefit plan subject to ERISA, 29 U.S.C. §§ 1002(1), (3), 1003(a). The Plan's published documents identify Honeywell as Plan Administrator, with discretionary authority to manage Plan administration, construe Plan terms, direct disbursements, establish rules, and delegate specified responsibilities. Upon information and belief, the operative summary plan description and related Plan documents applicable during the Class Period confer materially similar administrative authority on Honeywell or its appointed delegates. Honeywell maintains the governing versions and amendments.

18. At all relevant times, Honeywell sponsored a medical benefit program that, by its own account, was self-insured. The Plan's funding and administrative arrangements included employer financing and employee contributions. As of December 31, 2025, the Plan had over 44,000 participants. Honeywell acted as a fiduciary to the extent it exercised the authority or control described above. Plaintiff challenges the administration, communications, and handling of participant contributions under an allegedly noncompliant differential, not Honeywell's settlor decision to offer employee medical coverage.

## JURISDICTION AND VENUE

19. The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action seeks relief under ERISA, a federal statute.

20. This Court has personal jurisdiction over Honeywell because it maintains its principal executive offices in Charlotte, North Carolina. Honeywell sponsors the Plan from its Charlotte headquarters and, upon information and belief, exercises or directs substantial aspects of the challenged Plan administration there.

21. Venue is proper in the Western District of North Carolina under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Honeywell resides and may be found in this District and, upon information and belief, material aspects of Plan administration occur here. Honeywell's current corporate headquarters and the sponsor and administrator address are in Charlotte.

## FACTUAL BACKGROUND

### I. HONEYWELL'S TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements.

22. ERISA prohibits a group health plan or health insurance issuer from discriminating in premiums or contributions based on a health-status-related factor, including tobacco use. A plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); *see also* 42 U.S.C. § 300gg-4(b)(1).

23. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29

U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

24. Congress authorized the Secretary of Labor to prescribe regulations necessary or appropriate to carry out ERISA Title I, including its group-health-plan requirements. *See* 29 U.S.C. §§ 1135, 1191c. ERISA also incorporates the applicable Public Health Service Act requirements, including PHSA § 2705, through 29 U.S.C. § 1185d(a)(1). The statutory and regulatory framework therefore governs the Plan's tobacco-based premium differential. *See* 42 U.S.C. § 300gg-4; 29 C.F.R. § 2590.702.

25. Exercising that delegated authority, the Departments issued regulations in 2006 outlining the criteria for the wellness-program exception. See Final Regulations, 33158–59. Following the Affordable Care Act's amendments, the Departments proposed amended regulations in November 2012 and adopted the Final Regulations on June 3, 2013. Those regulations apply to plan years beginning on or after January 1, 2014. *Id.* at 33158–59. They governed the 2024 charges challenged by Plaintiff.

26. The Final Regulations specify the requirements that a health-contingent wellness program must satisfy to qualify for the statutory exception. The Departments explained that the rules establish criteria for an affirmative defense to a claim of health-status discrimination. Final Regulations, 33163. Once a participant alleges a discriminatory surcharge and facts showing the program's deficiencies, the employer invoking the exception must establish that its program satisfies the applicable statutory and regulatory conditions.

27. The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness

programs do not arbitrarily penalize participants and preventing employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the [] requirements are satisfied***.").

**B. Regulatory Criteria.**

28. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: The applicable limit is generally 30% of the total cost of coverage, increased to 50% to the extent attributable to tobacco-prevention or reduction programs. Employee-only coverage is the baseline unless a class of dependents may participate, in which event the applicable enrolled coverage cost is used. 29 C.F.R. § 2590.702(f)(4)(ii). Plaintiff does not assert a separate percentage-cap violation.

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who

does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice: all materials describing the program's terms must disclose the availability of a reasonable alternative or applicable waiver, include contact information for obtaining the alternative, and state that personal-physician recommendations will be accommodated. The same requirement applies to disclosures that an individual failed the initial outcome-based standard. 29 C.F.R. § 2590.702(f)(4)(v).

29. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

30. Regarding the first criterion, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

31. A central requirement is that the full reward remain available to all similarly situated individuals who satisfy a reasonable alternative during the applicable plan year. 29 C.F.R. § 2590.702(f)(4)(iv). Although a plan has flexibility concerning how to deliver the portion of the reward attributable to earlier months, it must deliver the full value rather than keep those amounts permanently. The Departments explained:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

32. The regulations also distinguish between making an alternative available and merely telling a participant to locate one without assistance. Example 8 describes a program that imposes a tobacco surcharge but tells the participant to find a cessation program, pay for it, and submit a certificate of completion. That program fails because the plan has not furnished a compliant alternative. *See* 29 C.F.R. § 2590.702(f)(4)(vi), Example 8; Final Regulations, 33180. Honeywell identifies no-cost cessation resources, but their availability does not excuse the independent full reward and notice violations alleged here.

33. For health-contingent wellness programs, the Final Regulations require the notice be disclosed "in ***all plan materials*** describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge participants more based on tobacco use and fail to provide the prescribed notice cannot invoke the wellness program exception.

## II. HONEYWELL CANNOT INVOKE ERISA'S WELLNESS PROGRAM EXCEPTION

34. Honeywell's tobacco surcharge creates a premium differential based on a health factor. Its 2025 New Hire Guide states that employees and covered spouses or domestic partners enrolled in the Honeywell Medical Plan who do not satisfy biometric screening requirements or who test positive for nicotine will be subject to additional charges. *See* Ex. A at 11. The 2024 enrollment FAQ likewise confirms that a positive nicotine test or a late screening could cause a surcharge to appear for 2024 coverage. *See* Ex. B at 2.

35. For 2027, Honeywell's June 2026 biometric FAQ identifies a maximum aggregate surcharge of $1,000 per covered individual, or $2,000 when an employee and covered spouse or domestic partner are both subject to charges. *See* Ex. D. It states that tobacco users enrolled in Honeywell medical coverage pay $1,000 more than nontobacco users for that plan year, while employees who fail screening may also face biometric penalties within the stated maximum. The charge increases the participant's cost for the same medical coverage based on tobacco-related status.

36. ERISA permits that health-based differential only if Honeywell satisfies the requirements governing outcome-based wellness programs, including full reward through a reasonable alternative and prescribed notice. *See* 29 U.S.C. § 1182(b)(2)(B); 29 C.F.R. § 2590.702(f)(4). Honeywell describes a tobacco-cessation route through its HealthResource program, which it says is available without cost to employees and eligible family members. Ex. A at 11; Ex. D, 2026 FAQ at 5–6.

37. Honeywell also requires a biometric screening, which includes a cotinine test intended to identify nicotine exposure. Honeywell uses Quest Diagnostics for screenings and permits a participant to submit a Physician Results Form based on an annual physician

examination. Participants who do not submit a screening may be treated as tobacco users unless they establish otherwise through HealthResource. A screening requirement and access to cessation support do not themselves establish compliance with the separate full-reward and notice conditions.

38. Honeywell's 2024 FAQ explains that employees who completed screening before September 30 and tested negative for nicotine should avoid the 2024 surcharge. Ex. B at 2. The same FAQ states that employees who completed screening after September 30 or tested positive for nicotine would see the surcharge during annual enrollment. It acknowledges that employees who screened later, received a HealthResource exception, or had a negative result might still see the charge because of processing delays and directs them to check benefit confirmations in December.

39. The 2025 New Hire Guide again makes the annual screening a precondition for avoiding nicotine-related surcharges and tells employees that tobacco-cessation support is available through HealthResource. But it does not explain whether an existing employee who completes a cessation alternative after the annual cutoff will be refunded or credited all surcharges imposed for that plan year. Nor does it assure participants that successful completion of the alternative will provide the same dollar-for-dollar annual reward available to a tobacco-free participant. Ex. A at 11.

40. The June 2026 FAQ describes a deadline of October 9, 2026 to complete a screening or, for a person who tests positive or is deemed a tobacco user, to enroll in a HealthResource cessation program and complete at least one coaching call to avoid the tobacco surcharge in 2027. Significantly, that FAQ also says a participant who misses the deadline can

complete a HealthResource cessation program by December 31, 2027, in which case tobacco surcharges imposed in 2027 "will be refunded." Ex. D, 2026 Biometric FAQ at 5–6.

41. The disclosed 2027 refund option does not establish that Honeywell furnished the full reward to participants in earlier years, nor does it cure separate notice defects in older and current materials. Upon information and belief, during relevant years before 2027, employees who completed a reasonable alternative after an advance cutoff were not uniformly granted the full plan-year value of avoiding the tobacco differential. Whether and to what extent Honeywell issued full-year refunds or equivalent credits throughout the relevant time period lies within Honeywell's records.

42. Honeywell's notice is independently deficient. The 2025 Guide's "Biometric Screening" passage describes required screening, nicotine-positive charges, free cessation support, and a HealthResource telephone number but contains no assurance that a participant's personal physician's recommendations regarding a reasonable alternative standard will be accommodated. Ex. A at 11. The 2024 FAQ describes charges and exceptions but likewise omits that required statement. Ex. B at 2. The same deficiency appears in other participant-facing materials. Honeywell's 2025 biometric mailer details the $500 biometric surcharge, $1,000 tobacco surcharge, and cessation-program requirements, but provides only generalized accommodation language without the required personal-physician assurance. Ex. C at 1–2. Honeywell's own benefits website likewise instructs tobacco users to enroll in a cessation program and complete at least one coaching call by October 9, 2026, to avoid the 2027 surcharge, yet omits that assurance. Each of these materials describes substantive program terms and must independently furnish the required regulatory notice.

43. The June 2026 biometric FAQ does not cure these deficiencies. Although it discusses pregnancy, significant medical circumstances, reasonable accommodations, and alternative standards, and its Physician Results Form permits a doctor to report tobacco status, none of those provisions informs participants that recommendations from their personal physicians concerning a reasonable alternative standard will be accommodated. Ex. D. The distinction matters: permitting a physician to report screening results or generally offering accommodations does not assure participants that their physicians' recommendations will be honored in establishing an alternative standard. Nor can a separate notice or hyperlink supply what Honeywell omitted from the participant-facing materials describing the surcharges and the conditions for avoiding them. The regulations permit substantially similar wording, but they require the substantive personal-physician assurance in each material describing the program's terms. *See* 29 C.F.R. § 2590.702(f)(4)(v), (f)(6).

44. Plaintiff incurred these charges throughout 2026 and in prior years. She did not know that an alternative could qualify her for the lower rate and did not recall receiving Plan materials explaining the required protections. Based on the surcharge imposed on her, her lack of notice, and Honeywell's later descriptions of the same program, Plaintiff alleges on information and belief that the same material notice and full reward deficiencies affected the wellness program in earlier years.

## III. HONEYWELL'S FINANCIAL BENEFIT FROM THE TOBACCO SURCHARGE

45. Honeywell has been identified as Plan Administrator with discretionary authority to manage Plan administration, construe Plan provisions, resolve disputes, direct disbursements, adopt administrative rules, and delegate appropriate functions. The Plan's 2025 Form 5500 names Honeywell as sponsor and administrator. Upon information and belief, Honeywell exercised

comparable authority during the challenged period over the surcharge, participant eligibility, alternative-standard procedures, and payroll contribution administration.

46. The Plan's funding structure makes the financial consequences of the surcharge concrete. Honeywell's Plan document described benefits financed through the sponsor's general funds or insurance contracts, with contributions from employees and Honeywell; its June 2026 FAQ expressly describes the medical program as self-insured and says the tobacco surcharge helps offset higher medical costs. Ex. D, 2026 Biometric FAQ at 5. Those statements link increased participant contributions to the resources used to meet medical-plan expenses.

47. The relationship is straightforward. Honeywell finances medical coverage with employer resources and participant contributions. Requiring a tobacco user to contribute more toward the same coverage adds participant funds to the funding mix. Upon information and belief, Honeywell applied the additional contributions to medical costs that otherwise would have required employer funding, preserving the corresponding corporate resources. That mechanism provided a financial benefit to Honeywell.

48. Honeywell's historical Plan provisions gave it responsibility for setting employee contribution rates and administering payments. The current Plan documents, participant-specific payroll deductions, and amounts that Honeywell or its delegates actually remitted, retained, refunded, or credited will establish the precise disposition of tobacco-related contributions. Plaintiff alleges on information and belief that these were employee medical-coverage contributions, rather than unrelated employment charges.

49. Honeywell directs participants to HealthResource to establish tobacco status and to enroll in cessation coaching. Its 2024 FAQ directs employees who see unexpected surcharges to Human Resources; the June 2026 FAQ directs participants to the Benefits Center to verify charges.

These are administrative processes affecting the amounts collected from particular participants and the disposition of their contributions. Plaintiff challenges the implementation, communication, retention, and refund administration of the surcharge under a noncompliant program.

50. Participant contributions withheld from wages for Plan coverage become Plan assets as of the earliest date they can reasonably be segregated from the employer's general assets. 29 C.F.R. § 2510.3-102(a)(1), (c). Once tobacco-related contributions became Plan assets, any authority or control over their management or disposition implicated fiduciary duties separate from the initial decision to establish a contribution schedule. Upon information and belief, Honeywell exercised such control, directly or through persons it appointed. Honeywell received or controlled the surcharge proceeds through its payroll and benefits-administration systems and, upon information and belief, used them within the Plan's shared-funding arrangement. To the extent those proceeds remained in employer-controlled accounts after becoming Plan assets, Honeywell also obtained their possession, use, and time value; in other words, the float.

51. Section 409 of ERISA separately requires breaching fiduciaries to make good Plan losses and restore profits made through the use of Plan assets. 29 U.S.C. § 1109(a). A loss to the Plan and a fiduciary's profit are distinct bases for relief. Honeywell maintains or controls the records necessary to test those allegations: payroll contributions, refunds or credits, Plan accounts, remittance records, employer payments, wellness decisions, participant notices, and medical-plan expenses. Those records will show whether improper contributions displaced corporate funding, whether Honeywell retained Plan assets after segregation became practicable, and any resulting profits or losses. Plaintiff seeks an accounting rather than assuming every surcharge dollar automatically constituted an improper fiduciary profit.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action individually and on behalf of similarly situated individuals under Federal Rule of Civil Procedure 23(a) and (b)(1), including a representative claim for Plan-wide relief under ERISA § 502(a)(2). The "Class Period" is the period from six years before the filing of this action through entry of final judgment, subject to applicable limitations periods and appropriate refinement after discovery.

53. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the United States who, during the Class Period, paid a premium differential based on tobacco-use status in connection with their participation in the Honeywell Benefit Plan.

54. Excluded from the Class are Honeywell's officers and directors, persons responsible for the challenged fiduciary conduct, the judicial officers assigned to this action, and their immediate families.

55. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

56. **Numerosity**. This action is appropriately suited for class treatment. Honeywell's materials report over 44,000 participants and while those figures reflect the overall number of participants in the Plan, not the number of tobacco-surcharge payors, Honeywell's materials explain that any participant who does not complete the screening will be defaulted into the tobacco surcharge. Upon information and belief, the Class includes at least hundreds of individuals, making joinder impracticable. Honeywell's enrollment, biometric-status, payroll, and contribution records will establish its precise size.

57. **Commonality**. This action involves questions of law and fact common to the Class, including:

a. whether Honeywell's tobacco surcharge creates a premium differential based on a health-status-related factor;

b. whether Honeywell made a compliant reasonable alternative standard and the same, full reward available to all similarly situated participants;

c. whether Honeywell provided the prescribed notice in all Plan materials describing the program, including the required physician-accommodation disclosure;

d. whether Honeywell breached fiduciary duties or engaged in prohibited transactions by administering the surcharge and participant contributions for its own financial benefit;

e. whether Honeywell prudently reviewed and monitored the reasonable-alternative and refund processes, payroll implementation, participant communications, and handling of Plan assets;

f. the appropriate mechanisms for Class-wide equitable restitution, surcharge, accounting, restoration of losses, and disgorgement of Honeywell's profits or other financial benefits.

58. **Typicality**. Plaintiff's claims are typical because she participated in the Plan, was classified as a tobacco user, and paid the challenged surcharge throughout 2026 and in prior years. She advances the same statutory and fiduciary theories as the Class. The principal questions concerning Honeywell's program terms, notices, refund practices, administration of alternatives, and treatment of participant contributions can be resolved through common evidence. Differences in the amounts collected or the applicable coverage tier do not change the central alleged violations.

59. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the Class's interests. She participates in Honeywell-sponsored medical coverage and suffered the same kind of increased contribution and loss of use of funds challenged on behalf of the Class. She has retained counsel experienced in complex ERISA and class-action litigation and has no interests antagonistic to the Class.

60. Class treatment will permit the Court to address Honeywell's common program terms, notices, alternative-standard practices, and fiduciary conduct in one proceeding. Separate actions seeking Plan-level restoration, accountings, and changes to fiduciary administration could establish incompatible standards or practically impair other participants' interests in the same Plan-level relief, supporting Rule 23(b)(1). Honeywell has acted on grounds generally applicable to the Class, supporting appropriate injunctive and declaratory relief under Rule 23(b)(2).

## CAUSES OF ACTION

## COUNT I

### UNLAWFUL PREMIUM DIFFERENTIAL – FAILURE TO PROVIDE A COMPLIANT REASONABLE ALTERNATIVE STANDARD AND THE FULL REWARD

(Violation of ERISA § 702, 29 U.S.C. § 1182(b), and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(C)–(D); 29 C.F.R. § 2590.702(f)(4)(iii)–(iv))

61. Plaintiff re-alleges and incorporates by reference paragraphs 1–60 of this Complaint, excluding the allegations of the other Counts.

62. ERISA prohibits group health plans from requiring participants to pay more for coverage based on a health-status-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). Honeywell required Plaintiff and the Class to pay additional medical-coverage contributions based on tobacco status. That differential is unlawful unless Honeywell satisfies every condition of the statutory and regulatory exception for health-contingent wellness programs. 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3); 29 C.F.R. § 2590.702(f)(4).

63. Among those mandatory conditions, an outcome-based program must be reasonably designed to promote health and must make the full reward available to all similarly situated individuals through a reasonable alternative standard or, where applicable, a waiver. 42 U.S.C. § 300gg-4(j)(3)(C)–(D); 29 C.F.R. § 2590.702(f)(4)(iii)–(iv). An alternative that permanently withholds part of the reward from an otherwise qualifying participant does not satisfy that requirement.

64. The 2024 enrollment FAQ explains that positive nicotine results or screenings after September 30 could cause a surcharge to appear for 2024 coverage, and the 2025 Guide similarly conditions avoidance of surcharges on biometric results or completion. Exs. A at 11, B at 2. Neither material explains a process by which a tobacco user who completes an alternative during the coverage year receives the full annual value of avoiding the differential. Upon information and belief, in portions of the Class Period before 2027 Honeywell administered the deadline and refund process in a manner that withheld part of the annual reward from qualifying participants.

65. When an employer grants the lower price to a participant who satisfies the initial tobacco-free standard but retains earlier tobacco surcharges imposed on a similarly situated participant who satisfies the required cessation alternative during the same plan year, the latter receives only part of the reward. A prospective reduction alone fails to return earlier deductions. The central question is whether Honeywell actually made the same monetary value available in the earlier years at issue.

66. Honeywell's 2026 Biometric FAQ expressly promises refunds of 2027 tobacco surcharges when cessation programming is completed by December 31, 2027. Ex. D. That promise is not the basis of an allegation that a 2027 refund has already been withheld. It instead demonstrates that the employer knows how to describe and administer a full-year refund. The regulations impose the underlying obligation irrespective of whether a comparable remedy was disclosed or supplied in earlier years.

67. Upon information and belief, Honeywell imposed the differential during portions of the Class Period before 2027 without making the same, full reward uniformly available to participants satisfying a reasonable alternative. The surcharge paid by Plaintiff is challenged as a statutory premium differential, not merely as an individual request for a discretionary refund.

68. That differential violates 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b), incorporated through 29 U.S.C. § 1185d(a)(1), if Honeywell cannot establish the conditions of the wellness exception. Plaintiff and Class Members paid amounts they should not have been required to pay under a noncompliant program and lost use of the money withheld.

69. Because Honeywell imposed the tobacco-based differential without making the full reward available through a compliant alternative to all similarly situated participants, it cannot invoke ERISA's wellness program exception. Plaintiff challenges the lawfulness of the differential she paid, not simply the adjudication of an individual refund request.

70. The resulting surcharge is an unlawful difference in the cost of coverage based on a health factor, in violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b), incorporated through 29 U.S.C. § 1185d(a)(1). It caused Plaintiff and Class Members to pay amounts that could not lawfully be required under the challenged program and deprived them of the use of those funds.

71. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes participants and beneficiaries to enjoin practices that violate ERISA and obtain other appropriate equitable relief. Plaintiff and the Class seek restitution of traceable funds, equitable surcharge against Honeywell in its fiduciary capacity, disgorgement, an accounting, declaratory relief, and other equitable relief necessary to redress these violations, without duplicate recovery.

## COUNT II

## UNLAWFUL PREMIUM DIFFERENTIAL – FAILURE TO PROVIDE REQUIRED NOTICE

### (Violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v))

72. Plaintiff re-alleges and incorporates by reference paragraphs 1–60 of this Complaint, excluding the allegations of the other Counts.

73. The 2025 New Hire Guide describes the biometric requirement and nicotine-based surcharges and gives a HealthResource number for cessation assistance. Ex. A at 11. It does not state that an employee's personal physician's recommendations regarding an appropriate alternative standard will be accommodated. The absence is especially material because the Guide tells employees that they will be charged for positive nicotine test results.

74. The 2024 enrollment FAQ likewise identifies the timing and nicotine-result conditions that trigger a surcharge and describes HealthResource exceptions. Ex. B at 2. It does not disclose that a participant who cannot satisfy the initial standard is entitled to a reasonable alternative offering the same reward, including accommodation of personal-physician recommendations as the regulation requires.

75. These documents describe material program terms affecting coverage cost. They must independently include the prescribed notice. Honeywell cannot meet that requirement by inviting employees to search a different webpage or telephone HealthResource, or by furnishing a general medical-exception procedure elsewhere. The regulations require the protections to be communicated in the materials containing the operative wellness terms.

76. Honeywell's 2026 Biometric FAQ provides more detail about HealthResource, one-coaching-call requirements, screening alternatives, and a promised 2027 refund, but the tobacco-policy and surcharge descriptions do not tell participants that their personal physicians' recommended alternative standards will be accommodated. General references to a physician's results form and accommodations for pregnancy or significant medical issues do not substitute for the prescribed personal-physician notice.

77. The Biometric Mailer also included a detailed description of the biometric screening requirements but failed to include the necessary information regarding notice and the

physician-accommodation statement. Even assuming Honeywell furnished an additional wellness notice somewhere else, that does not eliminate the regulatory duty to include the required disclosures in the 2024 FAQ, 2025 New Hire Guide, Biometric Mailer, and other descriptions of the program's substantive terms. The failure is independent of whether HealthResource personnel could have explained an accommodation if asked.

78. Honeywell's notice omissions independently defeat the wellness program exception. Upon information and belief, Plaintiff paid the differential without receiving the required clear information about a reasonable alternative yielding the same reward and accommodating personal-physician recommendations. The Class suffered increased medical-coverage costs under the same materials and administration.

79. Because Honeywell did not provide the prescribed notice in ***every*** Plan material describing the program's terms, the resulting differential violates 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b), incorporated through 29 U.S.C. § 1185d(a)(1), unless Honeywell establishes a compliant statutory exception. Plaintiff and the Class suffered increased coverage costs and loss of use of their money.

80. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek equitable relief, including restitution of traceable funds, accounting, disgorgement, equitable surcharge against Honeywell in its fiduciary capacity, declaratory and injunctive relief, and other proper remedies, without duplicate recovery.

## COUNT III

## BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF)

**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109; Brought Under 29 U.S.C. § 1132(a)(2))**

81. Plaintiff re-alleges and incorporates by reference paragraphs 1–60 of this Complaint, including the allegations concerning Honeywell's fiduciary status, administration of the surcharge, treatment of participant contributions, and resulting financial benefit.

82. Honeywell is the Plan Administrator and named fiduciary. Upon information and belief, Honeywell possessed and exercised materially similar administrative authority during the Class Period over wellness qualification, notices, contribution administration, and the refund process.

83. Honeywell's participant materials direct participants to HealthResource and Honeywell's benefits systems for screening, exceptions, cessation participation, and surcharge inquiries. Upon information and belief, Honeywell or persons acting under its authority made or reviewed the discretionary administrative decisions establishing the procedures for qualifying for removal, receiving credits or refunds, and communicating those rights. Those acts constitute the fiduciary conduct challenged here.

84. Honeywell also acted as a fiduciary to the extent it exercised authority or control over Plan assets. Its publicly described financing structure includes employee contributions and employer funding, and participant tobacco surcharges are treated as medical-coverage contributions. Upon information and belief, Honeywell controlled their payroll collection, segregation, remittance, disposition, and refund to the extent of the responsibilities it actually exercised. *See* 29 U.S.C. § 1002(21)(A).

85. To the extent Honeywell delegated wellness, payroll, or communication functions during the relevant period, it remained obligated to prudently select and monitor persons performing fiduciary functions within the scope of Honeywell's responsibilities. The actual written delegations and monitoring procedures are within Honeywell's possession.

86. Honeywell was required to discharge fiduciary duties with care, skill, prudence, and diligence and solely in the interests of Plan participants and beneficiaries. 29 U.S.C. § 1104(a)(1). Those duties apply to its actual fiduciary implementation of medical-plan administrative processes and management or disposition of Plan assets.

87. Upon information and belief, Honeywell failed to ensure that its published descriptions of the tobacco program contained the notices mandated by ERISA. The 2024 FAQ and 2025 New Hire Guide expressly identify nicotine-related surcharges and other operative program terms while omitting the personal-physician accommodation assurance. Those deficiencies concern communications over which Honeywell or its delegates exercised discretionary administrative responsibility.

88. Upon information and belief, Honeywell also failed to ensure that participants who satisfied a reasonable alternative during relevant plan years before 2027 uniformly obtained the full annual reward. The pre-year deadlines and absence of a described full-year refund mechanism in its earlier materials warrant scrutiny of the actual practice.

89. Honeywell collected additional participant contributions from tobacco users through payroll or other premium collection mechanisms. Its 2026 Biometric FAQ states that these tobacco-related charges help offset the medical costs of its self-insured plan. Upon information and belief, Honeywell used those contributions toward Plan expenses that otherwise would have required corporate funding, retaining a corresponding economic benefit.

90. Participant contributions become Plan assets when they can reasonably be segregated from employer general assets. 29 C.F.R. § 2510.3-102(a)(1). To the extent Honeywell exercised control over contributions after they became Plan assets, those acts were fiduciary

conduct. Plaintiff alleges that Honeywell used or retained such assets for its own benefit where those contributions had been collected or administered in violation of the wellness requirements.

91. Upon information and belief, Honeywell obtained avoided expenditures, retained cash, interest, float, or other measurable financial benefits through its actual use or retention of those contributions. The amounts and duration depend on the actual funding arrangements, payroll timing, refunds and credits, and Plan-asset segregation, all to be determined from records. Plaintiff does not treat ordinary lawful receipt of contributions as self-dealing by itself.

92. Honeywell breached its fiduciary duties by failing to prudently administer and communicate the surcharge protections while benefiting financially from increased employee contributions. Its materials omitted the personal-physician accommodation language and, upon information and belief, its pre-2027 administration failed to furnish the full reward to qualifying participants in all relevant circumstances.

93. If Honeywell maintains that full refunds, physician-directed alternatives, waivers, or other protections were actually available, their absence from the participant materials is itself a material administrative and communication failure. Honeywell was obligated to provide accurate notices of rights affecting a participant's cost of medical coverage. Uncommunicated rights do not satisfy the requirement to furnish the prescribed notice in each material describing the program.

94. Upon information and belief, Honeywell failed to conduct a prudent periodic review of its surcharge, reasonable-alternative and refund practices, participant communications, payroll implementation, and treatment of the resulting contributions. The written omissions appear in its own materials. Any absence or inadequacy of review allowed deficiencies and resulting charges to continue.

95. To the extent Honeywell delegated the challenged fiduciary functions, it failed to prudently monitor the delegates performing them. Honeywell knew or should have known that tobacco surcharges increased participant funding of its self-insured medical program and that its materials did not contain all mandatory notices. Upon information and belief, it did not ensure that participants received the full reward in earlier years or that participant Plan assets were protected from misuse for Honeywell's benefit.

96. Honeywell's financial interest made its administrative and monitoring obligations especially significant. Additional employee contributions applied to medical costs could reduce the corporate resources otherwise used for those expenses. Honeywell accordingly had a financial incentive to ensure the surcharge was collected, while its fiduciary responsibilities required faithful adherence to ERISA's disclosure, alternative-standard, and Plan-asset rules.

97. These acts, to the extent committed in a fiduciary capacity, violated ERISA's duties of loyalty and prudence. Honeywell administered and communicated the surcharge contrary to mandatory protections, and upon information and belief exercised control over participant contributions in a manner that benefited itself. *See* 29 U.S.C. § 1104(a)(1). Plaintiff challenges unlawful fiduciary implementation and use of assets, not the legitimate use of lawfully collected contributions to pay medical benefits.

98. Honeywell is a party in interest as the employer and, to the extent of its functional fiduciary conduct, a Plan fiduciary. 29 U.S.C. § 1002(14). Upon information and belief, Honeywell caused participant-derived Plan assets arising from a noncompliant surcharge to be used for its benefit in violation of 29 U.S.C. § 1106(a)(1)(D), and dealt with Plan assets in its own interest or for its own account in violation of § 1106(b)(1). Applicable exemptions, if any, are affirmative defenses. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 702–04 (2025).

99. ERISA does not permit a fiduciary to retain profits obtained through breaches simply because a Plan remained able to pay medical claims. Section 409 separately requires a breaching fiduciary to make good losses to the Plan and restore profits obtained through the use of Plan assets. 29 U.S.C. § 1109(a). Plaintiff seeks those forms of Plan-level relief to the extent supported by discovery and proof.

100. As a result of the alleged breaches, Honeywell obtained financial benefits, upon information and belief, through the use of participant contributions to defray medical-plan expenses, displacing corporate funding and obtaining possession and time value of the amounts. Any Plan loss and Honeywell's associated profits, earnings, float, or avoided expenditures can be determined through an accounting and discovery.

101. Honeywell maintains or controls records identifying tobacco contributions, alternative-standard decisions, notices, refunds, Plan and employer payments, and accounts holding or receiving employee contributions. Those records will establish the dates contributions became Plan assets, whether the proceeds displaced employer financing, and the amount of any profit or Plan loss attributable to the conduct challenged here.

102. Plaintiff brings this claim in a representative capacity on behalf of the Plan under 29 U.S.C. § 1132(a)(2). Plaintiff is a participant in the Plan and paid the surcharge throughout the relevant period. Plaintiff's increased contributions provide a concrete personal stake in the challenged administration. Plaintiff seeks Plan-level restoration of losses and fiduciary profits under 29 U.S.C. § 1109(a), an accounting, and other appropriate relief for the Plan. If restored amounts reflect improper participant payments, Plaintiff seeks their equitable administration for affected participants without duplicate recovery.

## COUNT IV

**BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)**

**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106; Brought Under 29 U.S.C. § 1132(a)(3))**

103. Plaintiff re-alleges and incorporates by reference paragraphs 1–60 of this Complaint, including the factual allegations concerning Honeywell's fiduciary authority, administration, control of contributions, financial benefit, and failure to monitor.

104. Honeywell was the Plan Administrator and named fiduciary responsible for administering the Plan. Its Plan documents vest the administrator with discretionary authority to interpret Plan terms, direct disbursements, and delegate administrative functions. Upon information and belief, Honeywell exercised materially similar fiduciary authority over the surcharge, participant notices, alternatives, refunds, and relevant Plan assets during the Class Period.

105. Honeywell breached its fiduciary duties by administering and communicating the surcharge in a manner that caused Plaintiff to pay more for medical coverage under a noncompliant program. Its materials did not disclose the mandated personal-physician accommodation right, and upon information and belief the alternative and refund practices in years before 2027 did not always furnish the full annual reward. Honeywell continued to collect the additional contributions while failing to correct those deficiencies.

106. To the extent Honeywell contends Plaintiff could have obtained full reimbursement, an individualized alternative, a physician-directed accommodation, a waiver, or other relief through a process not adequately disclosed, it failed to communicate and administer that process prudently. Plaintiff did not know that a physician-directed reasonable alternative could qualify her and her spouse for the lower rate because that information was not presented to them.

107. Honeywell also failed to prudently monitor delegates responsible for the challenged functions to the extent it had a duty to select and monitor them. Upon information and belief, Honeywell knew that its published materials omitted mandatory disclosures and that the surcharges increased participant contributions, but failed to ensure correction of the notices and complete administration of alternatives and rewards in earlier years.

108. Those failures directly injured Plaintiff. She paid the tobacco surcharge throughout 2026 and lost possession and use of the amounts deducted from her wages. Because Honeywell lacked a compliant basis for imposing the differential, she paid more than could lawfully be required for her coverage. Its inadequate communications also deprived her of an informed opportunity to invoke a reasonable alternative or other available protection. Her injury is the additional money collected and retained, not merely the denial of information in the abstract.

109. Honeywell obtained a corresponding financial benefit to the extent the added contributions were used to pay self-insured medical-plan costs that otherwise required corporate funding or were retained in accounts it controlled after becoming Plan assets. The Plan documents describe employer and employee contributions as funding sources, and the 2026 Biometric FAQ confirms the economic rationale for tobacco-related charges. *See* Ex. D. The precise mechanics and amount are subject to proof.

110. Plaintiff suffered the loss of her money while Honeywell obtained the corresponding savings, retained cash, use of funds, and any associated profits or earnings. The amount and disposition of those gains can be determined through an accounting. Appropriate equitable relief includes restitution of identifiable funds or proceeds, a constructive trust or equitable lien where tracing permits, disgorgement of fiduciary profits, and equitable surcharge for losses caused by the fiduciary breaches.

111. Honeywell's financial interest made its administrative and monitoring failures especially significant. To the extent the additional participant contributions displaced corporate funding, Honeywell benefited from the same conduct it was obligated to review and correct. The claim concerns the fiduciary implementation and communication of the program and disposition of participant funds, independently of any nonfiduciary decision to adopt the program.

112. Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek appropriate equitable relief to redress these fiduciary breaches and enforce ERISA, including equitable restitution, surcharge, disgorgement, an accounting for profits, a constructive trust or equitable lien over traceable funds or profits, declaratory relief, and appropriate equitable relief. These remedies are pled alternatively or cumulatively as legally appropriate, without duplicative recovery. Plaintiff does not assert a claim for payment of medical-expense benefits under § 1132(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against Honeywell and that the Court award the following relief:

A. An Order certifying this action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing the undersigned as Class Counsel;

B. A declaration that Honeywell's tobacco-based premium differential violates ERISA § 702, 29 U.S.C. § 1182, and the applicable wellness-program requirements;

C. An Order requiring Honeywell, through appropriate equitable relief, to reimburse or credit Plaintiff and Class Members for amounts by which they paid more for medical coverage under the noncompliant tobacco differential;

D. A declaration that Honeywell breached its fiduciary duties and engaged in prohibited transactions under 29 U.S.C. §§ 1104 and 1106 by the challenged administration, communication, monitoring failures, and use of participant Plan assets for its own benefit;

E. An Order requiring an accounting of tobacco-related contributions collected and retained, refunds or credits provided, the disposition of those funds, and the resulting losses, profits, or other financial benefits;

F. Appropriate injunctive relief barring continued unlawful administration, requiring compliant disclosures and a reasonable-alternative process that provides the full reward, and correcting the challenged treatment of participant contributions;

G. Disgorgement of profits, avoided expenditures, float, investment returns, and other financial benefits Honeywell obtained through the challenged fiduciary conduct;

H. Equitable restitution of traceable amounts and proceeds, including a constructive trust or equitable lien where appropriate, for Plaintiff and Class Members;

I. Equitable surcharge against Honeywell for losses caused by its fiduciary breaches or unjust enrichment redressable through that remedy;

J. Relief to the Plan under 29 U.S.C. §§ 1109 and 1132(a)(2), including restoration of losses and profits made through the use of Plan assets, an accounting, removal or replacement of fiduciaries if warranted, and appropriate equitable administration of restored participant contributions;

K. An award of prejudgment interest on amounts awarded, as permitted by law;

L. An award of reasonable attorneys' fees, expenses, and taxable costs under ERISA § 502(g), 29 U.S.C. § 1132(g), the common-fund doctrine where applicable, or other applicable authority; and

M. Any other relief the Court determines just and proper, without duplicate recovery.

Dated: November 18, 2026

Respectfully submitted,

**SIRI & GLIMSTAD LLP**

*/s/ Dana S. Smith*
Dana S. Smith (Bar No. 51015)
Oren Faircloth (*pro hac vice* forthcoming)
William H. Payne (*pro hac vice* forthcoming)
525 North Tryon Street, Ste 1600
Charlotte, North Carolina 28202
Tel: (980) 533-4616
E: dsmith@sirillp.com
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*